William A. MITCHELL, Appellant,

v.

Christine R. HUGHES, Appellee.

No. 95–FM–1051.

District of Columbia Court of Appeals.

Argued Jan. 14, 1997.
Decided June 29, 2000.

Robert A. Taylor, Jr., for appellant.

Atina S. Harley, with whom David J. Cynamon, Washington, DC, was on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and KING, Senior Judge.[*]

TERRY, Associate Judge:

This is a custody dispute between the father and the mother of a minor child. A Superior Court judge awarded temporary custody of Dana Nicole Mitchell to her mother, appellee Christine Hughes; a few weeks later, another Superior Court judge awarded sole permanent custody of Dana to Ms. Hughes. Dana's father, appellant William Mitchell, contends that the court did not have *in personam* jurisdiction over him, that it erroneously rejected his claim of *forum non conveniens,* and that the court did not act in the best interests of the child. We affirm.

I

Dana was born in the District of Columbia on November 20, 1993. Her parents were not and have never been married to each other. For the first ten months of her life, until September 1994, Dana lived with Ms. Hughes in a house on R Street, N.W. Mr. Mitchell resided in another part of the city from November 1993 to June 1994; for three months thereafter, until September 1994, he lived with his mother

---

[*] Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

and sister in Bowie, Maryland, a nearby suburb of the District of Columbia.

In September 1994, during an unsupervised visit, Mr. Mitchell kidnapped Dana and took her to North Carolina.[1] Ms. Hughes immediately filed a petition for custody in the Superior Court; a few months later, on January 20, 1995, she filed an "amended complaint for permanent custody and child support." There is a dispute as to whether Mr. Mitchell was properly served with the amended complaint on February 1, 1995, at his mother's house in Bowie, Maryland, as the process server stated in his affidavit of service. Mitchell claims not only that he was never served with the summons and complaint, but that the process server did not have a place of business in the District of Columbia and that the alleged service was invalid for that reason as well. The trial court, after an evidentiary hearing on April 11,[2] ruled that the evidence did not support Mr. Mitchell's claim that he had not been properly served.

Ms. Hughes then obtained a temporary custody order from the Superior Court on May 15. While she was attempting to enforce the order in North Carolina, Mr. Mitchell on May 22 filed a "complaint for child custody" in a North Carolina court which made no mention of the May 15 order from the District of Columbia. As a result, the North Carolina court issued an emergency *ex parte* order the same day granting temporary custody to Mr. Mitchell, even though the May 15 order had been recorded five days earlier, on May 17, in the North Carolina court.

After a hearing in North Carolina on the enforceability of the conflicting orders, the order that Mr. Mitchell had obtained on May 22 was vacated in light of the prior order from the District of Columbia. The North Carolina court acknowledged the validity of Ms. Hughes' permanent custody order, but it temporarily stayed enforcement of that order in North Carolina to give Mr. Mitchell an opportunity to seek a more permanent stay in the District of Columbia.

On July 5, 1995, following a hearing, a Superior Court judge issued a permanent custody order in favor of Ms. Hughes, accompanied by detailed findings of fact and an express conclusion of law that it was in the best interests of the child to award custody to the mother. Mr. Mitchell noted the instant appeal and later filed a motion to stay enforcement of the order. The trial court denied that motion on August 31, noting that Mr. Mitchell had been given ample opportunity to present evidence at two earlier custody hearings on the issue of what would be in Dana's best interests, but had chosen not to do so. Additionally, the court ruled that Mr. Mitchell had failed to demonstrate that the July 5 permanent custody order was clearly erroneous or that there was any likelihood of success on his appeal from that order.

In the absence of a stay from the Superior Court, the North Carolina court ordered Mr. Mitchell to return Dana to Ms. Hughes. When he refused to do so, a contempt hearing was scheduled for September 5, 1995. Faced with the contempt proceeding, Mr. Mitchell turned Dana over

1. According to the trial court's findings of fact, on September 9 Mr. Mitchell told Ms. Hughes that he was taking Dana to buy her a pair of shoes, but instead he absconded with her to North Carolina. Ms. Hughes did not see her child again and had no knowledge of her whereabouts or state of health until May 6, 1995, almost eight months later, when she was able to visit with the child at a motel in North Carolina. The trial court also found that Mr. Mitchell was arrested for violating the Parental Kidnapping Act, D.C.Code § 16–

1022 (1997). A formal charge of that violation was filed in the Superior Court by the Corporation Counsel, but the record does not reveal the outcome of that case.

2. Present at the hearing were Ms. Hughes, her counsel, Mr. Mitchell's counsel, and Mr. Mitchell's mother, who testified as a witness along with the process server, Henri Dingle. Mr. Mitchell himself, however, was not present.

to Ms. Hughes.[3] Mr. Mitchell has had both supervised and unsupervised visits with Dana since then, but she has remained in her mother's custody.

## II

■ Mr. Mitchell maintains that he was never served with either the original or the amended complaint for custody and child support, and that he never voluntarily submitted himself to the jurisdiction of the District of Columbia courts. He asserts (1) that he was not in Maryland at the time the amended complaint was allegedly served upon him there, and (2) that the process server was not a resident of the District of Columbia, did not maintain a place of business in the District, and thus was not authorized to serve the summons.

The Uniform Child Custody Jurisdiction Act, D.C.Code §§ 16–4501 *et seq.* (1997) ("UCCJA"), sets forth the manner in which service of process is authorized in a case such as this. The statute provides, in pertinent part:

Notice required for the exercise of jurisdiction over a person outside the District [of Columbia] shall be given in a manner reasonably calculated to give actual notice, and may be:

(1) By personal delivery outside the District in the manner prescribed for service of process within the District. . . .

D.C.Code § 16–4505(a)(1).

Rule 4(c)(2) of the Superior Court Domestic Relations Rules governs "the manner prescribed for service of process within the District." At all times pertinent to this case, the rule permitted personal service on a person within the District by "any competent person over the age of

eighteen years who is not a party to and is not otherwise interested in the suit and who is a bona fide resident of, or has a regular place of business in, the District of Columbia."[4] Mr. Mitchell contends that the process server, Henri Dingle, was ineligible to serve the summons and complaint in this case. Mr. Dingle did not check the box on the summons which stated that he had personally served Mr. Mitchell. He also failed to check the box which stated that he had left the summons with a person of suitable age and discretion. In the trial court, Mitchell's counsel made a factual proffer that Dingle was not a resident of the District of Columbia and did not maintain a place of business in the District.

Melissa Mitchell, appellant's sister, stated in an affidavit that her brother was in North Carolina on the day when the summons was served. She said that a man fitting Mr. Dingle's description came to her home on February 1, 1995, and knocked loudly on the door, but that she was frightened and did not open it. She then saw him "leave, stop, turn and look at the house, then proceed on with papers in his hand." A moment later she noticed that his car was gone, although she did not actually see him drive away. Ms. Mitchell also said that her brother had moved to North Carolina in September 1994 and was not present at her Maryland home on February 1, 1995.

Mr. Dingle testified at the hearing that he served the summons and amended complaint on a man of "medium build . . . a hundred and seventy to a hundred and ninety pounds approximately, five six, five seven . . . light brown complected" at the address of the Mitchell home in Bowie, Maryland, on February 1, 1995.[5] This

---

3. A subsequent motion for stay was denied by this court on September 11, 1995.

4. A 1998 amendment eliminated the requirement that service be made by a resident of, or someone with a regular place of business in, the District of Columbia. The rule now permits service by "any competent person eigh-

teen years of age or older who is not a party to the suit."

5. This was consistent with his affidavit of service, which was dated March 6, more than a month before the hearing. The affidavit states, "The person upon whom service was

weight and height is close to Mr. Mitchell's actual weight of 165 pounds and height of five feet six inches. Dingle also testified that he had been given a description and had "briefly" been shown a picture of Mr. Mitchell before he served the summons, and that the man who answered the door matched the description.

Effie Mitchell, William Mitchell's mother, testified that only she and her daughter Melissa were living at the house in Bowie, Maryland, on February 1, 1995. Her son had a key to the house, she said, but on February 1 he was at his home in North Carolina. Mrs. Mitchell said that neither she nor her daughter was at home during the day on February 1.[6]

In his affidavit of service, Mr. Dingle stated that he was "a competent person over eighteen (18) years of age residing or maintaining a regular place of business in the District of Columbia...." At the evidentiary hearing, Dingle testified that he generally worked out of the Superior Court of the District of Columbia. The court ruled that since Dingle had a post office box in the District and operated out of the Superior Court, he did maintain a regular place of business in the District. In its subsequent order awarding Ms. Hughes temporary custody, the court specifically found that "the court has personal jurisdiction because of personal service upon Defendant William A. Mitchell by a process server of this jurisdiction."

The court assessed the credibility of the witnesses at the hearing and reviewed the evidence. Considering all the information

presented at the hearing and in the affidavits supporting Mr. Mitchell's motion to dismiss, the court ruled that Mr. Mitchell had been properly served. Because this ruling depended on the court's express finding that Mr. Mitchell had in fact been served at his mother's home on February 1,[7] it cannot be reversed or set aside unless it is "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1997). On the present record, we hold, there was sufficient evidence to support the court's finding that Mr. Mitchell was in fact served with process on February 1. The fact that there was also evidence which might have supported a contrary finding does not warrant reversal.

The remaining question is one of law: whether a non-resident[8] process server who works only in the corridors of the Superior Court and maintains only a post office box—but no office—in the District of Columbia can be said to have "a regular place of business" in the District as required by Rule 4(c)(2). We conclude, in the circumstances of this case (particularly in light of the 1998 amendment to the rule, *supra* note 4, as well as the court's finding that Mr. Mitchell was in fact served), that if the process server had a place of business anywhere, it was in the District. We reach this conclusion because the "place of business" requirement serves no apparent useful purpose, is no longer required, is not itself an indicator of the reliability of the process server, and, most significantly, does not determine the question of whether service was actually made.[9]

---

**8.** It is undisputed that Mr. Dingle is a resident of Maryland.

**9.** Ms. Hughes suggests in her brief that, in child custody cases, strict service-of-process requirements do not apply, so long as the defendant is afforded an opportunity to be heard (as Mr. Mitchell was in this case). She cites no case law to this effect, however, and we have found none, at least in the District of Columbia. Nevertheless, some support for her argument is provided by D.C.Code § 16–4505(a), which requires only that service be made "in a manner reasonably calculated to

---

made accepted a copy of the complaint in this matter but refused to sign the return receipt."

**6.** This contradicted the statement in Melissa Mitchell's affidavit that she was at home when Mr. Dingle knocked on the door.

**7.** At a later hearing, the court told Mitchell's counsel that it had previously made "certain determinations as to credibility," that it had found "that in fact Mr. Mitchell was served at his mother's home in Maryland on the date as specified ... [in] the affidavit," and that it "did not believe defendant's witnesses."

## III

Mr. Mitchell asserts that the trial court sought to force him to litigate in an inconvenient forum and that in the interest of justice this case should have been heard instead in North Carolina. Consequently, he claims, Ms. Hughes' amended complaint should have been dismissed on the ground of *forum non conveniens*, or at least that the action should have been stayed until he filed for custody in North Carolina, because both the relevant private and public interests favored a trial there. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Crown Oil & Wax Co. v. Safeco Insurance Co.*, 429 A.2d 1376, 1380–1381 (D.C.1981). He maintains that the ease, expedition, and expense of the trial, the enforceability of a judgment once obtained, and Ms. Hughes' attempt to harass him by her choice of forum all compel the conclusion that North Carolina is the preferable forum. For additional support, he cites the administrative difficulties resulting from the congestion of local court dockets with foreign litigation, the imposition of jury duty on a community having no relationship to the litigation,[10] and the inappropriateness of requiring local courts to interpret the laws of another jurisdiction as further reasons why this case should not be heard in the District of Columbia. Given Mr. Mitchell's unlawful act of kidnapping Dana and taking her to North Carolina, we can find no abuse of discretion in the trial court's denial of his *forum non conveniens* motion.

Pertinent here are two statutes: the UCCJA and its federal counterpart, the Parental Kidnapping Prevention Act ("PKPA"), 28 U.S.C. § 1738A (1994). The UCCJA is the District's equivalent of the PKPA and is substantially identical to it. One of the main purposes of the UCCJA is to "[d]eter abductions and other unilateral removals of children undertaken to obtain custody awards." D.C.Code § 16–4501(a)(5); *see Rees v. Reyes*, 602 A.2d 1137, 1140 (D.C.), *cert. denied*, 503 U.S. 991, 112 S.Ct. 1686, 118 L.Ed.2d 400 (1992). The legislation enacting the PKPA contains very similar language. *See* Pub.L. No. 96–611, § 7(c)(6), 94 Stat. 3566, 3569 (1980) (one purpose of the PKPA is to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards"). Under the UCCJA, the Superior Court may exercise its jurisdiction in a child custody case if:

> (1) The District (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before commencement of the proceeding and the child is absent from the District because of his or her removal or retention by a person claiming his or her custody or for other reasons, and a parent or person acting as parent continues to live in the District[.]

D.C.Code § 16–4503(a). The physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine custody. D.C.Code § 16–4503(c). Moreover, in ruling on a claim of *forum non conveniens*, the court is expressly authorized by the UCCJA to consider whether "the exercise of jurisdiction by the Superior Court would contravene any of the purposes stated in section 16–4501, or any of the provisions of the Parental Kidnapping Prevention Act of 1980." D.C.Code § 16–4507(c)(5).

In *In re B.B.R.*, 566 A.2d 1032 (D.C. 1989), Judge Schwelb's concurring opinion addressed at some length the *forum non conveniens* doctrine as it relates to child custody cases:

give actual notice." In any event, although Ms. Hughes does not argue the point (and thus we do not decide it), it appears likely that service was made "in the manner prescribed by [Maryland] law," D.C.Code § 16–4505(a)(2). *See* Md. Rules 2–121, 2–123.

10. Mr. Mitchell apparently overlooks the fact that custody disputes are within the equity jurisdiction of the court and are not tried to juries.

A party should not be permitted to use improper or unlawful means to create or enlarge the child's connections with the party's own state, and to reduce or destroy the child's ties to the adversary's state, and then be heard to claim that the jurisdiction of the wrongdoing party's choice is the logical and appropriate one in which to litigate. To allow a contender for custody to do this would contravene the wise policy "that no man may take advantage of his own wrong."
. . .

. . . A major goal of the PKPA was to provide protection for the left-behind parent. . . . Under the UCCJA, too, "the days of spiriting children across state lines to litigate custody are over." . . . "Since the purpose of the [UCCJA] is to deter abductions and other unlawful conduct, it is held that a claimant cannot be permitted to rely on his or her wrongful conduct in order to establish jurisdiction in a foreign court." . . . Both the PKPA and the UCCJA should be construed with these considerations in mind.

\* \* \* \* \*

To permit jurisdictional "facts" created by wrongful conduct to control or affect the determination where the case is to be tried would have unjust and oppressive consequences.

*Id.* at 1042, 1044 (Schwelb, J., concurring) (citations omitted). We agree with these sentiments and adopt them as part of our holding here.

The undisputed facts of this case establish that the Superior Court had subject matter jurisdiction. Dana had been a resident of the District of Columbia within six months prior to the filing of Ms. Hughes' original complaint, and Ms. Hughes was still residing in the District. The only reason Dana was absent from this jurisdiction was that Mr. Mitchell had improperly and unlawfully removed her to North Carolina without Ms. Hughes' consent in order to claim custody. This court has long recognized the principle, applied in a broad variety of situations, that no person may take advantage of his own wrong. *See Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231, 232, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). Applying that fundamental principle and the specific provisions of the UCCJA, we hold that the trial court did not abuse its discretion in denying Mr. Mitchell's *forum non conveniens* motion.

## IV

■■■ In its permanent custody order, the trial court said:

It is in the best interest of the child to be in the custody of her mother, who has recognized the need to establish and maintain stability for the child but has also respected the father's interest in visiting the child. It is not in the child's best interest to be in the custody of her father, particularly in light of his disregard for the mother's visitation and his actions in removing the child from a stable and loving home with her mother.

D.C.Code § 16–914(a)(3) states that "[i]n determining the care and custody of infant children, the best interest of the child shall be the primary consideration." Mr. Mitchell now claims that Dana's best interests would be served by a hearing at which both parents are present and able to testify. He also renews allegations which he previously made in North Carolina pertaining to Ms. Hughes' supposed unfitness for motherhood.

■■■ Mr. Mitchell's argument has no merit whatsoever. He does not cite any case law which states that both parents must be present at a custody hearing, and we know of none. Indeed, if we were to accept his argument, any parent could frustrate or nullify the outcome of a custody hearing simply by not showing up. Because Mr. Mitchell elected not to participate in the custody hearings, he must bear the consequences of that decision. Trial court determinations of custody, child support, and visitation rights are subject to

reversal only for clear abuse of discretion, *see Moore v. Moore*, 391 A.2d 762, 770 (D.C.1978), and we find no such abuse here. There was more than sufficient evidence to demonstrate that the best interest of the child would be served by awarding custody to Ms. Hughes. Furthermore, since the North Carolina court did not attempt to disturb the permanent custody award even after learning of Mr. Mitchell's allegations regarding Ms. Hughes' fitness, we see no reason why this court should do so.

## V

The trial court's award of permanent custody to Ms. Hughes is therefore

*Affirmed.*